# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA


STEVEN JEAN-PIERRE,⟩                                          

|  |  |
|---|---|
| STEVEN JEAN-PIERRE, | ) |
| | )   Civil Action No. 09-266J |
| Plaintiff, | ) |
| | )   District Judge Kim R. Gibson |
| v. | )   Chief Magistrate Judge Lisa Pupo Lenihan |
| | ) |
| BUREAU OF PRISONS; JOHN | )   ECF Nos. 44, 49, 59 |
| YOST, Warden, FCI Loretto; and | ) |
| MARYANN PALKO, FCI Loretto | ) |
| Religious Chaplain, | |
| Defendants. | |


## REPORT AND RECOMMENDATION

## I.    RECOMMENDATION

For the reasons that follow, it is respectfully recommended that Plaintiff's Motion for Judgment on the Pleadings (ECF No. 44) be denied; Plaintiff's Motion to Dismiss, or in the alternative, Motion for Summary Judgment (ECF No. 59) be treated solely as a response to Defendants' Motion for Summary Judgment and denied as moot; and Defendants' Motion for Summary Judgment (ECF No. 49) be granted.

## II.    REPORT

Plaintiff, Steven Jean-Pierre, is a federal inmate who was confined at the Federal Correctional Institution at Loretto (FCI-Loretto), Pennsylvania from October 4, 2007, until August 20, 2009.[1]  Plaintiff initiated this action on October 8, 2009, by filing a Complaint against the following Defendants: the Federal Bureau of Prisons (BOP); Maryann Palko, FCI-

---

[1]      He is currently incarcerated at the Federal Correctional Institution at Allenwood Low, which is located in White Deer, Pennsylvania.

Loretto Religious Chaplain (retired); and John Yost, FCI-Loretto Warden (retired).  (ECF No. 3.)  His Complaint asserts liability pursuant to <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), alleging that during the time he was incarcerated at FCI-Loretto, Defendants discriminated against him based on his Rastafarian religious beliefs.  (ECF No. 3.)  Specifically, he alleges violations of his rights under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment because Defendant Chaplain Maryann Palko removed him from the Certified Religious Diet Program on June 3, 2008, and Defendant Warden John Yost refused to reinstate him in the program.  (ECF No. 3.)

On April 27, 2010, Defendants filed a Motion to Dismiss, or in the alternative, Motion for Summary Judgment.  (ECF No. 18.)  A Report and Recommendation was entered on July 30, 2010, wherein it was recommended that Defendants' motion be treated solely as a motion to dismiss and be granted as to Plaintiff's claims against the Federal Bureau of Prisons (BOP) and against the individual Defendants in their official capacity but denied in all other respects without prejudice to Defendants refiling a proper summary judgment motion and allowing Plaintiff to conduct relevant discovery.  (ECF No. 26.)  After Plaintiff filed Objections to the Report and Recommendation on August 18, 2010, the District Judge adopted the Report and Recommendation by Memorandum Order dated September 27, 2010.  (ECF Nos. 27, 28.)

Defendants filed an Answer and Affirmative Defenses to Plaintiff's Complaint on June 6, 2011, and Plaintiff filed a Motion for Judgment on the Pleadings and Opposition to Defendants' Answer and Affirmative Defenses on July 27, 2011.  (ECF Nos. 42, 44.)

On August 1, 2011, Defendants' filed a Motion for Summary Judgment.  (ECF No. 49.)  In support of their motion, Defendants attached twenty-six exhibits containing over two-hundred eighty pages of various documents relating to Plaintiff's claims.  (ECF No. 50.)  Defendants also

filed a Concise Statement of Material Facts (ECF No. 51) and a Brief in Support of their Motion for Summary Judgment (ECF No. 52). In response, Plaintiff filed a Motion to Dismiss, or in the alternative, a Motion for Summary Judgment (ECF No. 59),[2] a Brief in Support of the Motion (ECF No. 60), a Concise Statement of Material Facts (ECF No. 57), an affidavit (ECF No. 56), and over fifty-five pages of exhibits (ECF No. 58).

## A. Facts

The BOP has guidelines which afford inmates equitable opportunities to pursue religious beliefs and practices consistent with the security and orderly running of the institution and the BOP. BOP Program Statement 5360.09, Religious Beliefs and Practices, as codified at 28 C.F.R. § 548.10-548.20, states, in pertinent part: "The Bureau provides inmates requesting a religious diet reasonable and equitable opportunity to observe their religious dietary practice within the constraints of budget limitations and the security and orderly running of the institution and the Bureau through a religious diet menu." (ECF No. 50-11 at 18.)

The BOP's religious diet program, entitled the Alternative Diet Program, consists of two distinct components: (1) inmate self-selection from the main line, which includes a no-flesh option and access to the salad/hot bar, which is part of the food service program, and (2) a nationally recognized, religiously certified processed food component. (ECF No. 50-11 at 18.) The second component, known as the Certified Religious Diet Program, is a certified food component (kosher) with a nationally approved certified food menu, which is served to all inmates who are approved to participate in that program. (ECF No. 50-11 at 19.) Inmates wishing to participate in the Certified Religious Diet Program must first submit a written request

---

[2]     Plaintiff's motion was filed after the deadline for filing dispositive motions had passed. Defendants filed a Motion to Strike. The Court denied the motion but ordered that the filing would be treated as a response to Defendant's motion for summary judgment.

and then have an oral interview with a Chaplain. (ECF No. 50-11 at 19.) Inmates who are admitted into the Certified Religious Diet Program can be removed from the program if, among other things, they are observed eating from the main line or purchase and/or consume non-certified foods from the commissary. (ECF No. 50-11 at 20.) If an inmate requests to be reinstated into the program, an oral interview is conducted prior to reinstatement. (ECF No. 50-11 at 20.)

Plaintiff is a member of the Rastafarian faith and has been so for over 30 years. (ECF No. 57 at 1.) Plaintiff asserts that among his beliefs and customs is the strict abstention from foods containing pork and pork by-products as well as foods prepared with, or served on, vessels and using utensils which have come into contact with pork. (ECF No. 50-17 at 16, No. 57 at 6.) According to Plaintiff, the certified food served on the Certified Religious Diet Program is the only food that meets his religious dietary requirements as a Rastafarian because the cooking vessels are not contaminated by pork, whereas the self-selection options are served in vessels that could have also held foods containing pork. (ECF No. 50-17 at 16, No. 57 at 6.) Plaintiff testified in his deposition that a lot of Rastafarians are vegan or follow the "Ital" diet, both of which exclude fish, meat, poultry, eggs, and other animal products, but he explained that he does not follow an Ital diet because he needs protein to remain healthy and keep his muscles alive. (ECF No. 50-17 at 9, 10, 12.) Plaintiff states that he has been on the BOP's Certified Religious Diet Program since 1998. (ECF No. 57 at 7.)

On June 3, 2008, while at FCI-Loretto, Plaintiff was observed by Defendant Palko taking a piece of broccoli from the dining room. (ECF No. 3 at 2-3.) In his Complaint, Plaintiff stated that part of the broccoli had dirt on it and he was taking it to his unit to have it properly cleaned before it could be consumed. (ECF No. 3 at 3.) Due to this incident, Plaintiff was issued a

Notification of Inmate Religious Diet Violation and was suspended from the Certified Religious Diet Program for thirty days after which time he could apply for reinstatement. (ECF No. 50-13 at 2.) The Violation stated:

> This suspension is not meant to be a punishment. The purpose is to determine if the religious diet is truly the most appropriate diet to meet your needs. I take the Religious Diet very seriously, and trust you will too. Should you choose to return to the program, I trust you will more faithfully adhere to the requirements.

(ECF No. 50-13 at 2.) Plaintiff admits that, under BOP policy, inmates at FCI-Loretto are forbidden to remove food items from the dining hall (ECF No. 50-17 at 17) and he was previously suspended from the Certified Religious Diet Program four months earlier after he was caught removing a green banana from the dining hall (ECF No. 50-17 at 19).

On July 5, 2008, Plaintiff submitted an inmate request form to Defendant Palko requesting that he be reinstated in the Certified Religious Diet Program because the diet was "the best and most appropriate diet" to meet his needs because "no pork or pork byproducts are allowed in the Rasta diet." (ECF No. 50-3 at 2.) The following day, Defendant Palko denied his request stating "your needs concerning the religious diet can be met by participating in the alternative diet. On the alternative diet no pork, nor pork by-products, nor any meat is served. You may also eat from the hot bar and the salad bar." (ECF No. 50-3 at 2.) Plaintiff claims that Defendant Palko's denial was a clear attempt to alter his religious practices by recommending that he eat an alternative diet that consists of unclean foods, which is an abomination of his religious views. (ECF No. 57 at 15.)

On July 8, 2008, Plaintiff submitted an Administrative Remedy Informal Resolution Form in which he sought reinstatement into the Certified Religious Diet Program and complained that Defendant Palko had denied him reinstatement without first interviewing him

and that the alternative diet she recommended was against his faith.  (ECF No. 50-5 at 2.)  He

further complained that:

> Chaplain Palko has been displaying a great deal of (prejudice) towards me based
> on my religiuos [sic] faith.  The fact is at the time Chaplain Palko removed me
> from the religious diet, she also removed (18 people) from the program, and she
> has reinstated all 18 people to the program and denied me.  All because they were
> (Jews and Muslim) and I was the only Rasta.

(ECF No. 50-5 at 3.)

Also on July 8, 2008, Plaintiff sent a request to Defendant Yost that he be reinstated into

the program because it was the only diet that met his religious needs.  (ECF No. 50-4 at 2.)

Specifically, Plaintiff stated that his Rastafarian beliefs prohibited him from eating anything

from the main line because pork and pork products regularly were served on the main line and

therefore, the trays, utensils and vessels for cooking or serving are contaminated by pork or pork

by-products.  (ECF No. 50-4 at 2-3.)  The request was forwarded to Defendant Palko at which

point she conducted an interview with Plaintiff to determine his dietary needs.  (ECF No. 50-15.)

Defendant Palko stated that, during the interview on July 12, 2008,

> [P]laintiff explained his Rastafarian beliefs prohibited him from eating pork or
> any pork by-products.  He cited Old Testament, Leviticus 11:32 in support of his
> beliefs, and further explained that they prevent him from eating from trays,
> utensils and vessels for cooking or serving that are contaminated by pork or pork
> by-products.

(ECF No. 50-10 at 6.)  Following the interview, Defendant Palko found that Plaintiff's religious

needs would be best served by participating in the first option of the Alternative Diet Program,

which provides for self-selection from the main line, including a no-flesh option and access to

the salad/hot bar.  (ECF No. 50-10 at 7.)  As such, Plaintiff was approved to participate in the

main line component of the Alternative Diet Program on July 14, 2008.  (ECF No. 50-10 at 7,

No. 50-16 at 2.)

According to Defendant Palko, she approved Plaintiff to participate in only the main line component of the program based on his answers to her interview questions. (ECF No. 50-10 at 7.) "Specifically, [Plaintiff] was unable to articulate his religious dietary needs, other than by concluding that he needed the certified food component." (ECF No. 50-10 at 7.) She stated that, during the interview, Plaintiff incorrectly described the terms "kosher" and "halal" demonstrating that he lacked understanding of the purpose of the Certified Religious Diet Program. (ECF No. 50-10 at 7.) Furthermore, she found that Plaintiff's concerns regarding contamination by pork and pork by-products were satisfied by the main line component because "[a]ll food service trays, utensils, etc., are washed at 150 degrees and rinsed at 180 degrees, so there can be no remaining residue from pork or pork by-products." (ECF No. 50-10 at 7.) On July 14, 2008, Defendant Yost denied Plaintiff's request for reinstatement into the Certified Religious Diet Program. (ECF No. 50-4 at 4.)

On July 21, 2008, Defendant Palko responded to Plaintiff's July 8, 2008, Administrative Remedy Informal Resolution Form stating that, per their conversations, Plaintiff would be required to submit documentation demonstrating that the Certified Religious Diet Program is a religious dietary requirement for Rastafarians. (ECF No. 50-5 at 2.) She also noted that Plaintiff did not have a clear understanding of "certified processed foods" and that he had previously been interviewed on July 12, 2008, and his answers reflected that of the Jewish religion. (ECF No. 50-5 at 2.) Plaintiff responded to Defendant Palko's request for an outside source by submitting documents consisting of a letter sent to another inmate from Ralph E. Severin, a Rastafarian chaplain in the State of New York Department of Correctional Services, and a memorandum written by Abunna Ascento Foxe, another Rastafarian chaplain in the State of New York Department of Correctional Services. (ECF No. 50-6, No. 50-25.) In his deposition, Plaintiff

admitted that the documents he submitted from Chaplains Severin and Foxe did not show that he was required to be on the Certified Religious Diet Program, but it did "quote the Bible verse where [it states] to not [ ] touch the swine, not to touch anything that could touch it, to stay away from it." (ECF No. 50-17 at 26.) In a response dated July 27, 2008, Defendant Palko denied Plaintiff's request to be placed on the Certified Religious Diet Program explaining that: "At the time Leviticus was written clay pots were used and these were pourous [sic] thus residue may have remained. Today trays, utensils, etc. can be washed at high heat to remove all residue." (ECF No. 50-6 at 2.)

On July 25, 2008, Plaintiff filed another Request for Administrative Remedy with Defendant Yost seeking reinstatement into the program explaining that Defendant Palko was showing prejudice against him because he was a Rastafarian. (ECF No. 58-1 at 55.) He stated that Defendant Palko had reinstated all 18 people who were taken off the program at the same time he was without asking them to provide documentation that he was required to produce. (ECF No. 58-1 at 55.) In his response dated August 15, 2008, denying Plaintiff's request to be reinstated, Defendant Yost stated:

> According to Rastafarian beliefs one may not eat swine or any pork by-products. According to Leviticus 11:32, any item that comes in contact with the unclean animal will be made clean by putting it into water. All food service trays, utensils, etc. are washed at 150 degrees and rinsed at 180 degrees.
>
> The Rastafarian chaplain sent a copy of "Dietary Food Items Eaten by Rastafarians" in which it states which foods you may eat. The dietary needs for Rastafarians, according to this list, can best be met by self-selection from the main line foods which includes the no-flesh option. All foods on the hot bar and the salad bar are also no-flesh.

(ECF No. 3-3 at 11.)

Plaintiff filed a Regional Administrative Remedy Appeal to the Regional Director on August 25, 2008, requesting to be reinstated to the Certified Religious Diet Program. (ECF No. 58-1 at 50-51.) The Regional Director denied the appeal on September 23, 2008, stating:

> A document from the minister of the Rastafarian religion certifies that you would be best served by eating from the no-flesh portion of the Religious Diet Program. All the items that are available on the list provided by the minister are on the Mainline and No-Flesh diet program. In addition, your record demonstrates that you have been removed from the program five times for violations in two different institutions and you continually purchase items that are not kosher from the commissary. You have demonstrated that you can and do eat other than kosher foods. Based on the above, the Chaplain properly placed you on the correct component of the Religious Diet Program and your appeal has been denied.

(ECF No. 58-1 at 52.) Lastly, Plaintiff filed an appeal with the Administrator of National Inmate Appeals, which was denied on January 13, 2009. (ECF No. 58-1 at 47-49.)

Defendant Palko was advised during the fall of 2008 by Edward Roberts, Religious Services Administrator at the BOP's Northeast Regional Office, that Chaplains should have a conversation, rather than an interview, with an inmate requesting reinstatement in the Certified Religious Diet Program. (ECF No. 50-19 at 7.) After Chaplain Roberts advised Defendant Palko of this policy interpretation, she offered to reinstate Plaintiff in the Certified Religious Diet Program. (ECF No. 50-19 at 7.) Plaintiff admits that, in about early 2009, Defendant Palko offered to reinstate him to the Certified Religious Diet Program, and in response to her offer, he told her, "[Y]ou should have been nice way before that. Thank you but no thank you. I'll see you in court." (ECF No. 50-10 at 7, No. 50-17 at 23.) A few days later, Plaintiff was reinstated to the program after submitting a request to another chaplain at FCI-Loretto. (ECF No. 57 at 20.)

As relief, Plaintiff seeks a declaration that Defendants Palko and Yost, as well as the BOP, violated his rights, plus repayment of the filing fee and reimbursement of commissary expenses in excess of $1,400.00 and unspecified compensatory and punitive damages. (ECF No. 3.)

## B. Plaintiff's Motion for Judgment on the Pleadings

Pursuant to Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." In deciding a motion for judgment on the pleadings, the court must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. Sikirica v. Nationwide Ins. Co., 416 F.3d 214, 220 (3d Cir. 2005). A motion for judgment on the pleadings "should not be granted 'unless the moving party has established that there is no material issue of fact to resolve, and that it is entitled to judgment in its favor as a matter of law.'" Mele v. Federal Reserve Bank of New York, 359 F.3d 251, 253 (3d Cir. 2004) (quoting Leamer v. Fauver, 288 F.3d 532, 535 (3d Cir. 2002)).

As addressed below with respect to Defendants' Motion for Summary Judgment, Plaintiff fails to demonstrate that there is a basis to grant judgment on the pleadings in his favor. Therefore, it is recommended that Plaintiff's Motion for Judgment on the Pleadings be denied.

## C. Summary Judgment Standard

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element to that party's case and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of

identifying evidence or the lack thereof that demonstrates the absence of a genuine issue of material fact. <u>National State Bank v. Federal Reserve Bank of New York</u>, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. <u>Matsushita Elec. Ind. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986). The inquiry, then, involves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Brown v. Grabowski</u>, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting <u>Anderson</u>, 477 U.S. at 251-52). If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. <u>Anderson</u>, 477 U.S. at 249-50. Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. *See* Fed. R. Civ. P. 56(c); <u>Celotex</u>, 477 U.S. at 324; <u>J.F. Feeser, Inc., v. Serv-A-Portion, Inc.</u>, 909 F.2d 1524, 1542 (3d Cir. 1990).

### D. First Amendment – Free Exercise of Religion Claim

Plaintiff claims that Defendants violated his First Amendment right to exercise his religion by denying him a diet consistent with his Rastafarian beliefs when they removed him from the Certified Religious Diet Program and re-assigned him to the main line component of the Alternative Diet Program.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. CONST. amend. I. The First Amendment is applicable to the states via the Fourteenth Amendment. DeHart v. Horn, 227 F.3d 47, 50 (3d Cir. 2000). The Supreme Court has held that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison," Bell v. Wolfish, 441 U.S. 520, 545 (1979), including those protections afforded by the First Amendment, such as its proscription against any law prohibiting the free exercise of religion. DeHart, 227 F.3d at 50. However an inmate retains only those "First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). Accordingly, in order to establish a First Amendment violation to the free exercise of religion, a plaintiff must show that defendants prevented him from exercising that right without any justification that is reasonably related to a legitimate penological interest. See Banks v. Beard, 548 U.S. 521, 528 (2006) (citing Turner v. Safley, 482 U.S. 78, 89 (1987)); see also Dreibelbis v. Marks, 675 F.2d 579, 580 (3d Cir. 1982) (prison officials may restrict the exercise of an inmate's religious expression "when necessary to facilitate some legitimate goals and policies of penal institutions").

Additionally, the "mere assertion of a religious belief does not automatically trigger First Amendment protections. To the contrary, only those beliefs which are both sincerely held and religious in nature are entitled to constitutional protections." DeHart, 227 F.3d at 51. Accordingly, when a prisoner claims that his or her right to exercise religion has been curtailed, a court must determine as a threshold matter whether the prisoner has alleged a belief that is both sincerely held and religious in nature. Id. If so, the court must then apply the four-factor test set forth in Turner v. Safley, 482 U.S. 78 (1987), to determine whether the curtailment at issue is

"reasonably related to penological interests."[3] DeHart, 227 F.3d at 51. In determining whether a restriction is reasonably related to legitimate penological interests, a court must weigh: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives," or, in other words, whether the rule is an "exaggerated response to prison concerns." Turner, 482 U.S. at 89-90. The ultimate burden is on the plaintiff to disprove the validity of the regulation or decision. Overton v. Bazzetta, 53 U.S. 126, 132 (2003). However, defendants must put forward the legitimate governmental interest alleged to justify the regulation or decision. Turner, 482 U.S. at 89. Unless a prisoner can point to evidence showing the policy is not reasonably related to legitimate penological objectives, sufficient to allow him to prevail on the merits, he cannot prevail at the summary judgment state. Beard, 548 U.S. at 530.

1. Sincerely Held Religious Belief

As an initial matter, Defendants assert that the record evidence in this case demonstrates that Plaintiff's religious beliefs regarding his dietary restrictions are neither sincerely held nor religious in nature and therefore he does not have a First Amendment protected interest. "[I]f a prisoner's request for a particular diet is not the result of sincerely held religious beliefs, the First Amendment imposes no obligation on the prison to honor that request, and there is no occasion to conduct the Turner inquiry." DeHart, 227 F.3d at 52.

---

[3]     "Although the Turner test was articulated in the context of challenges to prison regulations, as opposed to challenges to individual conduct, the analysis in the later context is the same." Heleva v. Kramer, 214 F. App'x 244, 246 (3d Cir. 2007) (citing Ford v. McGinnis, 352 F.3d 582, 595 n.15 (2d Cir. 2003)).

In support of their assertion, Defendants submitted evidence demonstrating that Plaintiff failed to follow his own dietary restrictions by purchasing non-certified foods from the Commissary on numerous occasions. Specifically, Defendants submitted Commissary receipts showing that, during the time he was designated to FCI-Loretto and FCI-Schuylkill[4], Plaintiff purchased items not designated as "kosher" or "halal" on 32 separate occasions. (ECF No. 52 at 6-7, No. 50-23, No. 50-24.) These food items included the following: chili-flavored ramen noodles, Cajun shrimp ramen noodles,[5] cheese bars, nacho chips, pop tarts, turkey logs, vegetable soup, Hershey's ice cream, buttered popcorn, Twix chocolate bars, Thai rice noodles, peanut butter cookies and chocolate-chip cookies. (ECF No. 52 at 7, No. 50-23, No. 50-24). During his deposition, Plaintiff admitted that he consumed at least eight cheese bars that were not designated as "kosher" or "halal," but claimed that he gave most of the other food items to inmates who were indigent or traded the items in exchange for services or foods that were kosher. (ECF No. 52 at 8, No. 50-17 at 28-29.) Plaintiff initially asserted in his deposition that he maintains a kosher diet, but after he was confronted with Commissary receipts for food items that were not designated as "kosher" or "halal," he stated the he only followed a kosher diet during the time that he was on the Certified Religious Diet Program. (ECF No. 52, No. 50-17 at 26.) However, Defendants point out that Plaintiff's Commissary receipts show he purchased peanut butter cookies and chocolate chip cookies that were not designated as "kosher" or "halal" in July 2010, at which time he was approved for the Certified Religious Diet Program at FCI-Schuylkill. (ECF No. 52 at 8-9.)

---

[4] Plaintiff was designated to a Federal Correctional Institution in Schuylkill County, Pennsylvania from approximately September 2009 until September 2010.

[5] Records reveal that Plaintiff purchased a total of 195 packages of Cajun shrimp ramen noodles from July 2, 2008, through June 8, 2009. (ECF No. 50-24.)

Defendants have also submitted evidence by way of the BOP's computerized records system indicating that Plaintiff has been removed from the Certified Religious Diet Program on at least eight occasions, including the June 2008 removal at issue in this case. (ECF No. 52 at 6, No. 50-7.) During these instances, Plaintiff was removed from the program for various reasons, including failure to comply with his religious diet. For example, one time Plaintiff was removed from the program because he had a piece of cake from the main line on his tray. (ECF No. 52 at 6, No. 56 at 3, No. 57 at 7.) Plaintiff agreed that removal was appropriate in this instance but alleged that he intended to give the cake to another inmate. (ECF No. 50-17 at 18, 20, No. 56 at 3, No. 57 at 7.) Another time Plaintiff was removed because he was observed by a member of the kitchen staff taking drinks from the beverage bar on two separate occasions. (ECF No. 52 at 6, No. 50-8.) Plaintiff was again removed from the program based on an observation by the same kitchen staff member that he was taking food from the main line. (ECF No. 52 at 6, No. 50-9.) Plaintiff, however, disputes these instances attributing them to a "personal vendetta" the member of the kitchen staff had against him and not any violation of the program on his part. (ECF No. 50-17 at 17, No. 57 at 10.) Also, similar to the June 2008 incident at issue in this case, Plaintiff was removed from the program for attempting to take a banana outside of the dining room. (ECF No. 50-17 at 19, No. 56 at 4.) However, Plaintiff claims that the banana was green and thus was considered, not a fruit, but a vegetable which had to be cooked before it could be consumed. (ECF No. 50-17 at 19, No. 56 at 4.)

When asked about other instances when he was removed from the program, Plaintiff explained that one time he was misidentified as an inmate who had violated the program rules but an investigation cleared him of any wrongdoing and he was subsequently reinstated to the program. Plaintiff also stated that he was taken off the program when he first arrived at FCI-

15

Loretto because he was placed in special housing but he was later reinstated into the program once he was placed in general population. (ECF No. 50-17 at 18, 19, No. 56 at 3.) Plaintiff disputes other instances whereby records show he was removed from the program claiming either that the records are incorrect or that he was removed from the program for an invalid reason. (ECF No. 50-17 at 18, 20, No. 56 at 3, 4.)

In support of their contention that Plaintiff's request is not religious in nature, Defendants assert that Plaintiff's desire to participate in the Certified Religious Diet Program is based on considerations of health and physical appearance rather than his religious beliefs. (ECF No. 52 at 11.) They note that Plaintiff stated in his deposition that most Rastafarians are vegan or follow the Ital diet but he chooses not to adhere to the Ital diet because his muscles need protein and he does not like to eat a lot of carbohydrates. (ECF No. 52 at 11, 50-17 at 12.) However, according to Plaintiff, all Rastafarians share the belief that they are forbidden to eat unclean, unholy foods as dictated by the Bible. (ECF No. 56 at 2.) He claims that his own personal religious beliefs regarding his diet come from the Bible, Leviticus, Chapter 11, which prohibits him from eating pork or pork by-products and from eating on trays, utensils, and other vessels which have been contaminated by pork or pork by-products. (ECF No. 56 at 2.) Plaintiff states that the Certified Religious Diet Program best meets his needs because the cooking vessels are not contaminated by pork, whereas the self-selection options are served in vessels that could have also held foods containing pork. (ECF No. 50-17 at 16.)

Finally, Defendants assert that Plaintiff's request to participate in the Certified Religious Diet Program is not sincere because Defendant Palko offered to reinstate him into the program in early 2009, and in response to her offer Plaintiff told her "you should have been nice way before that. Thank you but no thank you. I'll see you in court." (ECF No. 52 at 11-12, No. 50-10 at 7,

No. 50-17 at 23.)  However, as Plaintiff points out, he requested to be reinstated to the program shortly after Defendant Palko's offer.

The Court finds that, based on the record, there is evidence from which a reasonable factfinder could conclude that Plaintiff has a sincerely held belief that his religion requires him to maintain a kosher diet that is free of pork and pork-based products.  As to his prior removals from the Certified Religious Diet Program, Plaintiff denies having ever violated the program by actually consuming food from the main line, and with respect to his purchases of non-kosher food items from the Commissary, he denies consuming the majority of the items he bought claiming to have given most of the food away to indigent inmates.  A factfinder may conclude that because Plaintiff admitted to eating the cheese-bars, and more likely than not consumed other non-kosher food items he purchased, his belief that he is required to eat a kosher diet is not sincerely held.  But the evidence in the record does not compel such a conclusion.  A factfinder could conclude that Plaintiff, like many other people, holds religious beliefs which at times he fails to live up to even though those beliefs are sincerely held.

The Court concludes that Defendants are not entitled to summary judgment on the basis that Plaintiff's beliefs regarding his diet are not sincerely held and religious in nature.  Thus, the Court will turn to an analysis of the <u>Turner</u> factors.

2.  <u>Turner Factors</u>

Defendants assert that the application of the <u>Turner</u> factors to this case demonstrate that legitimate penological interests justified Plaintiff's removal from the Certified Religious Diet Program.

Under the first <u>Turner</u> factor, it is the prison officials' burden to demonstrate a rational connection between the regulation or decision at issue and a valid penological interest.  <u>Fontroy</u>

v. Beard, 559 F.3d 173, 177 (3d Cir. 2009). "[T]his burden, though slight, must 'amount to more than a conclusory assertion.'" Wolf v. Ashcroft, 297 F.3d 305, 308 (3d Cir. 2002) (quoting Waterman v. Farmer, 183 F.3d 208, 217 (3d Cir. 1999)). A regulation bears no valid, rational connection to the asserted penological goal if the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary and irrational. Waterman, 183 F.3d at 215. However, courts accord great deference to the judgment of prison officials "charged with the formidable task of running a prison." O'Lone v. Estate of Shabazz, 482 U.S. 342, 353 (1987).

With respect to the first Turner factor, it appears as though Defendants argue that they are entitled to summary judgment because the main line component of the Alternative Diet Program does not contravene Plaintiff's religious beliefs. (ECF No. 52 at 13.) However, Plaintiff contends that it does as he explained that he can only eat food that is free of pork and pork by-products and the food offered on the no-flesh diet is not compatible with his religious beliefs because it has been cooked in or prepared with utensils previously used to prepare pork or pork based products. As explained by the court in Jupiter v. Johnson, No. 3:10-CV-01968, 2011 U.S. Dist. LEXIS 115406, at *39-40 (M.D. Pa. Apr. 26, 2011), a case out of the Middle District of Pennsylvania that involved a similar issue:

> It is not for the defendants to determine that a diet that the plaintiff contends does not comply with his religion does in fact comply with his religion. This is so because in addressing a prisoner's request for a particular diet the issue is not whether such diet is an orthodox requirement of a particular religion. *See generally*, Thomas v. Review Board of Indiana Employment Security Division, 450 U.S. 707, 715-16 (1981) ("[T]he guarantee of free exercise is not limited to beliefs which are shared by all members of a religious sect."). Rather, the issue is whether the prisoner's belief that such a diet is necessary is sincerely held and religious in nature, in the prisoner's scheme of things. DeHart, 227 F.3d at 51.

As previously noted, Defendants are not entitled to summary judgment as a matter of law on the issue of the sincerity of Plaintiff's religious beliefs, and Defendants are also not entitled to summary judgment on the basis that, contrary to Plaintiff's assertions, the diet offered on the main line component of the Alternative Diet Program complies with his religious beliefs.

Also with respect to the first <u>Turner</u> factor, Defendants assert that the penological interest of maintaining security is served by removing inmates from the Certified Religious Diet Program, such as Plaintiff, who fail to abide by its rules by removing their religious food from the dining hall. (ECF No. 52 at 13.) According to Defendants, the purpose of this policy is to guard against the security risk in which inmates on the Certified Religious Diet Program may sell or barter their food to other inmates who do not receive such foods. (ECF No. 52 at 13, No. 50-10 at 5.) Moreover, Defendants assert that removing food from the dining hall poses an additional security risk in that the food may be used in the illicit production of alcohol. (ECF No. 52 at 13.) They also assert that it poses a health risk if the food is allowed to rot in the inmate's housing unit. (ECF No. 52 at 13.)

It is clear that a prison's interest in maintaining security is a legitimate penological concern under <u>Turner</u>, <i>see</i> <u>Overton v. Bazzeta</u>, 539 U.S. 126, 133 (2003) (prison security is "perhaps the most legitimate of penological goals"), and it is also reasonable to conclude that Defendants' decision to suspend inmates from the Certified Religious Diet Program, such as Plaintiff, who remove food from the dining hall bears some rational relation to security concerns that may be implicated by the potential for inmates on the program to sell or barter their certified food component items. However, the same cannot be said for Defendants' concerns surrounding the production of alcohol and rotting food as such concerns would still exist even if an inmate were removed from the program and placed on the main line. Nevertheless, it is not irrational to

think that Plaintiff's continued placement in the Certified Religious Diet Program could possibly involve some risk of security. As such, the Court finds that Defendants have met their ever so slight burden of demonstrating a rational connection between their actions and a valid penological interest, and we will turn our attention to the remaining Turner factors.

With respect to the second Turner factor, courts are to "focus on the burden that the regulation or action imposes on an inmate's ability to engage in constitutionally protected activity." DeHart, 227 F.3d at 53. "[C]ourts must examine whether an inmate has alternative means of practicing his or her religion generally, not whether an inmate has alternative means of engaging in the particular practice in question." Id. at 55. Defendants assert, and Plaintiff does not dispute, that while at FCI-Loretto, he was afforded alternative means of expressing his religious beliefs. (ECF No. 52 at 14.) Specifically, Plaintiff was able to participate in other Rastafarian religious practices, such as meditating, growing dread locks and abstaining from shaving, listening to reggae music, chanting and beating drums, observing Saturdays as the Sabbath and a day of rest, holding religious ceremonies in the prison chapel, fasting occasionally, and wearing headgear known as a "crown." (ECF No. 52 at 14, No. 50-17 at 1213.) Clearly, there were other avenues of religious practice open to him at FCI-Loretto, and these alternative means of expressing his Rastafarian faith must be taken into account in determining the overall reasonableness of Defendants' decision to remove him from the Certified Religious Diet Program. Therefore, the second Turner factor weighs in favor of Defendants.

Turning to the third Turner factor, the Court must analyze the impact that providing Plaintiff with certified religious food would have on other inmates, prison personnel, and prison resources generally. Defendants contend that "[P]laintiff's demonstrated noncompliance with religious diet program policies would have adversely impacted the orderly operation of the

prison if he had been reinstated to the Certified Religious Diet Program." (ECF No. 52 at 15.) For example, Defendants assert that providing certified religious meals to inmates such as Plaintiff who do not comply with the rules of the program would require additional supervision to ensure they were not removing certified religious food items from the dining hall. (ECF No. 52 at 15.) However, this argument holds no weight because, pursuant to BOP policy, no inmate is allowed to remove food from the dining hall whether they are on the Certified Religious Diet program or served food from the main line. Thus, there would be no need for additional security and any impact that accommodating Plaintiff's request to be placed on the program would have on prison resources as it relates to that need is inconsequential.

On the other hand, Defendants argue that providing certified religious meals to inmates such as Plaintiff who do not comply with the rules of the program would strain the BOP's budgetary resources. (ECF No. 52 at 15.) Defendants maintain that the average daily cost to feed one inmate three meals per day in 2010 was $2.385 for main line meals and $7.56 for meals under the Certified Religious Diet Program.[6] (ECF No. 52 at 15.) While it undoubtedly cost more to feed an inmate in the Certified Religious Diet Program and the prison has a financial interest in restricting the program to those inmates who adhere to its rules, the parties are in dispute as to whether Plaintiff was removed from the program for failing to abide by those rules. It is Defendants' position that Plaintiff violated and was removed from the program for taking his certified religious food from the dining hall. In fact, Plaintiff had been removed from the program for the same reason just months before the incident in question. However, while Plaintiff readily admits that, pursuant to BOP policy, inmates are not allowed to remove food of

---

[6]     Defendants state that the BOP no longer has access to information that would enable it to determine prior to 2010 the average daily cost to feed one inmate (3 meals per day) for mainline meals, or for meals under the Certified Religious Diet Program. (ECF No. 52 at 15.)

any kind from the dining hall, he argues that there is nothing in the BOP's program statement regarding the Certified Religious Diet Program that states that an inmate may be found in violation of the program for this reason.

Pursuant to the BOP's Program Statement regarding Religious Beliefs and Practices, P.S. 5360.09 (December 31, 2004), § 548.20(b), Dietary Practices, an inmate may be removed from the Certified Religious Diet Program if the inmate is observed eating from the main line or purchases and/or consumes non-certified foods from the commissary.  (ECF No. 50-11 at 20.) Similarly, the Institution Supplement requires inmates at FCI-Loretto to comply with all requirements of the Certified Religious Diet Program, and provides that inmates violating these requirements may be removed from the program for certain periods of time:

> ***The inmate must comply with all the requirements of the program.***  An inmate may eat only those foods that are on the certified processed food tray.  An inmate will be in violation if he selects foods from the regular menu or is found to have food from the regular menu in his possession.  He will use only the disposable utensils, cups and dishes that are on his Certified Food tray otherwise he will be considered in violation.
>
> If an inmate is found to be in violation of the program he will not be able to participate for the following periods of time: first, second and third offense – up to thirty days each time.  After the fourth offense the inmate may be removed from the program for a period of up to one year from the date of this offense, after which he may reapply.  Inmates who voluntarily withdraw may be restricted from reapplying for a period of up to thirty (30) days.

IS 5360.09C, Religious Beliefs and Practices, § 4i (May 8, 2007) (emphasis added); (ECF No. 50-12 at 6.)

According to evidence submitted by Defendants, it appears as though the BOP's Program Statement does not provide for an exhaustive list of program violations and inmates at FCI-Loretto are given a complete list of program rules and requirements when they are granted

approval to participate in the Certified Religious Diet Program.[7]  *See* ECF No. 53 at 30 (In response to an inmate request for administrative remedy from an inmate who was removed from the program for taking food from the dining hall and seeking clarification as to what program rule he broke, Defendant Palko stated that inmates are given a list of rules when first placed on the religious diet program and those rules are not found in any BOP program statement). Specifically, it appears that inmates participating in the Certified Religious Diet Program at FCI-Loretto from 2007 to 2009 who were found with food removed from the dining hall could be suspended from the program for a period of up to 30 days, and inmates not participating in the program could be issued an Incident Report for violating BOP rules.  (ECF No. 72-1 at 5-6.) The evidence submitted by Defendants demonstrates that numerous inmates were suspended from the program for violating this rule, (ECF No. 53 at 10, 18, 26, 27, 30, 31, 32), and most importantly, Plaintiff himself was previously suspended from the program for violating this rule not more than four months before the incident in question.

To the extent Plaintiff argues that he did not violate the program rules because the BOP program statement did not state that an inmate could be suspended from the Certified Religious Diet Program for removing food from the dining hall, his argument is unavailing.  Whether or not Plaintiff was given a complete list of program rules, he was clearly aware that it was a violation of the program to remove food from the dining hall given that he had previously been

---

[7]        At this point, we must note that Defendants failed to provide the Court with the list of the rules inmates receive when granted participation in the program, let alone even mention that inmates who are approved for the Certified Religious Diet Program are provided with rules outside of what is stated in the BOP's Program Statement regarding the program.  Indeed, the Court had to dig through voluminous pages of exhibits to learn that such rules even existed and only learned of such by way of a response to an inmate request for administrative remedy. Although it was made clear through the parties' pleadings that the BOP had a policy in place restricting inmates from removing food from the dining hall, or alternatively, possessing anything not authorized, no such information was provided to the Court as to whether an inmate could be found in violation and suspended from the Certified Religious Diet Program for the same reason.

suspended from the program for violating that rule in the past. Because the BOP has a financial interest in restricting the Certified Religious Diet Program to those inmates who adhere to its rules, of which Plaintiff did not do, the Court is inclined to find that this factor also weighs in favor of Defendants.

Finally, under the fourth <u>Turner</u> factor, courts are to look at the presence or absence of ready alternatives that would fully accommodate the plaintiff's rights at *de minimis* costs to valid penological interests. <u>Turner</u>, 482 U.S. at 90-91. "The absence of ready alternatives is evidence of the reasonableness of a prison regulation." <u>Id</u>. However, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's right at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." <u>Id</u>.

Like the third <u>Turner</u> factor, Defendants argue that the cost of permitting inmates to participate in the Certified Religious Diet Program without complying with its requirements would strain BOP financial resources, and they maintain that the self-selection of no-flesh offerings from the main line component is an appropriate alternative that would accommodate Plaintiff's religious dietary restrictions. (ECF No. 52 at 16.) However, as previously noted, Plaintiff has vigorously contested the proposition that the no-flesh option complies with his religious beliefs and therefore maintains that there is no appropriate alternative other than the Certified Religious Diet Program. According to Plaintiff, he did not request to be placed on a special, unique diet which was not already available or a diet that would complicate food service operation, demand additional staffing, increase security threats or incur incremental costs. He simply requested to be placed back on the diet that he had been on for more than ten years at the BOP, a diet that was already available and satsified his religious dietary restrictions.

The Court recognizes that the Certified Religious Diet Program is an established program at the BOP that Plaintiff had been on for approximately ten years, and Plaintiff's diet request could be accomplished at somewhat *de minimis* cost simply by reinstating him into the program. However, as previously noted, the BOP has a legitimate interest in reducing its costs and thereby restricts participation in the program to inmates who adhere to its rules, which Plaintiff did not do. Therefore, for purposes of summary judgment, the Court finds that the fourth <u>Turner</u> factor is neutral.

When evaluating the <u>Turner</u> factors, the Third Circuit has stated:

> Turner does not call for placing each factor in one of two columns and tallying a numerical result. The objective is to determine whether the regulation is reasonable given the prison administrators' penological concerns and the inmate's interest in engaging in the constitutionally protected activity. We agree with the defendants that where, as here, "other avenues" remain available for the exercise of the inmate's religious faith, "courts should be particularly conscious of the 'measure of judicial deference owed to correctional officials . . . .'" <u>Turner</u>, 482 U.S. at 90 (quoting <u>Pell v. Procunier</u>, 417 U.S. 817, 827 (19874)). Nevertheless, Turner does contemplate a judgment by the court regarding the reasonableness of the defendant's conduct under all of the circumstances reflected in the record. A decision or practice that represents an "exaggerated response" to even a legitimate penological concern will not justify an infringement of First Amendment rights. *See* 482 U.S. at 87.

<u>DeHart</u>, 227 F.3d at 59. After examining the <u>Turner</u> factors as applied to the instant case, the Court finds that Defendants' decision to remove Plaintiff from the Certified Religious Diet Program was reasonably related to legitimate penological interests and, accordingly, Plaintiff's right to the free exercise of his religion was not violated. As such, Defendants are entitled to summary judgment as to this claim.

**E. Equal Protection Claims**

The Court next considers Plaintiff's claims concerning alleged disparate treatment based on his religious beliefs. Plaintiff avers that Defendants violated his right to equal protection by

requiring that he undergo an interview and submit documentation after he applied to be reinstated into the Certified Religious Diet Program when they did not require the same from inmates of other faiths.  He also contends that Defendants reinstated all the other inmates who were removed from the Certified Religious Diet Program at the same time he was but did not reinstate him because he was the only Rastafarian.  He also asserts that all Rastafarians who applied for participation in the Certified Religious Diet Program were denied.

The Equal Protection Clause of the Fourteenth Amendment exists to protect similarly situated individuals from disparate treatment under the law or by some other state action. Artway v. Att'y Gen. of New Jersey, 81 F.3d 1235, 1267 (3d Cir. 1996).  The Equal Protection Clause "is not a command that all persons be treated alike but, rather, 'a direction that all persons similarly situated should be treated alike.'"  Id. (quoting City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985)).  "Treatment of dissimilarly situated persons in a dissimilar manner by the government does not violate the Equal Protection Clause."  Klinger v. Dep't of Corrs., 31 F.3d 727, 731 (8th Cir. 1994).

An equal protection violation in a prison setting requires proof that an inmate "was treated differently than others similarly situated as a result of intentional or purposeful discrimination . . . [The inmate] also must show that the disparity in treatment cannot survive the appropriate level of scrutiny, which, in a prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests."  Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005) (internal citation and quotation marks omitted); see also Wilson v. Schillinger, 761 F.2d 921, 929 (3d Cir. 1985).

Plaintiff first argues that Defendants discriminated against him by requiring that he undergo an interview when he applied to be reinstated into the Certified Religious Diet Program

following his removal. Plaintiff asserts that other inmates who were removed from the program were not interviewed when they applied for reinstatement. Defendants, however, state that it was Defendant Palko's practice prior to the fall of 2008 to interview inmates requesting reinstatement following removal, particularly those whose Central file did not include documentation indicating that the inmate had previously been interviewed for the program. (ECF No. 52 at 17.) They assert that this practice was consistent with the BOP's policy regarding religious beliefs and practices, which provides that, "[a]t the inmate's request for reinstatement, an oral interview will be conducted prior to reinstatement." (ECF No. 52 at 17) (citing P.S. 5360.09, Religious Beliefs and Practices, § 18(b) (December 31, 2004)). Plaintiff has failed to demonstrate that Defendant Palko subjected only him or Rastafarians to this practice, and the evidence submitted by Defendants show otherwise. Moreover, once Defendant Palko was advised by the Religious Services Administrator at the BOP's Northeast Regional Office that Chaplains should have a conversation, rather than an interview, with an inmate requesting reinstatement in the Certified Religious Diet Program, she offered to reinstate Plaintiff into the program, which Plaintiff refused.

Plaintiff also argues that Defendants violated his right to equal protection by requiring that he submit written documentation from his faith group stating that the Certified Religious Diet Program is a requirement for Rastafarians. According to Plaintiff, he "asked around" and discovered that other inmates were not required to provide similar documentation. (ECF No. 60 at 40.) Defendants maintain that Defendant Palko has requested religious diet documentation from inmates, other than Plaintiff and other than those who are Rastafarians, who sought to participate in the Certified Religious Diet Program, or to be reinstated into the program. (ECF No. 52 at 18.) According to Defendant Palko, she "would generally request religious diet

documentation from inmates in certain circumstances, such as where the majority of other inmates practicing the same religion at FCI-Loretto did not participate in the Certified Religious Diet Program, and where the inmates refused to discuss the option of participating in the main line component of the Alternative Diet Program." (ECF No. 52 at 18-19.) Plaintiff admitted that some Rastafarians at FCI-Loretto did not seek to participate in the Certified Religious Diet Program, and the documentation with which he provided Defendant Palko did not show that he was required to participate in the program. (ECF No. 50-17 at 17, 26)

Although Defendants did not submit any evidence demonstrating that Defendant Palko had in fact required other inmates to provide similar documentation, Plaintiff has failed to show that Defendant Palko's action in requesting the documentation was the result of intentional or purposeful discrimination. On the contrary, Defendant Palko requested the supporting documentation after Plaintiff had already been denied reinstatement into the program, and therefore, her actions could reasonably be construed as an offer to provide Plaintiff with a second chance.

Plaintiff next argues that Defendant Palko discriminated against him based on his religion because she removed more than eighteen other inmates from the Certified Religious Diet Program the same month he was removed from the program and reinstated all eighteen inmates except for him solely because he was a Rastafarian. Plaintiff was asked to explain his assertion during his deposition to which he responded that he made a small investigation among the inmates. (ECF No. 50-17 at 23-24.) However, Plaintiff could only identify two inmates that reported this information to him. (ECF No. 50-17 at 23-24.) Nevertheless, Plaintiff's own evidence rebuts his assertion.

Plaintiff submitted evidence that he obtained pursuant to a Freedom of Information Request that shows twenty-seven inmates were removed from the Certified Religious Diet Program from June 1, 2008, through November 22, 2008, (nine inmates removed the same month as Plaintiff), and according to the information provided, only seventeen of the twenty-seven inmates removed during that time period were eventually reinstated back into the program (and only three out of the nine removed the same month as Plaintiff were reinstated). (ECF No. 58-1 at 4.) The document is silent as to the religion of each of the inmates and Plaintiff maintains that some of the inmates who were removed did not seek reinstatement, but Plaintiff has nevertheless failed to establish that he was treated differently in that he was the only inmate that was not reinstated to the program because of his religion.

Lastly, Plaintiff argues that he and other Rastafarians were discriminated against based on their religion because they were not approved to participate in the Certified Religious Diet Program while inmates of other religions were freely granted participation. In fact, Plaintiff avers that "all Rastafarian inmates" who applied for the program were denied. (ECF No. 57 at 25.) According to Plaintiff, it is Defendants' belief that Rastafarians should be on an Ital diet which can be satisfied by participating in self-selection from the main line component of the Alternative Diet Program. (ECF No. 60 at 40, No. 56 at 5.) Plaintiff submitted evidence by way of several Inmate Requests for Administrative Remedies and responses thereto of which he claims demonstrates that seven Rastafarian inmates at FCI-Loretto complained of religious discrimination by Defendant Palko for failing to grant them participation in the Certified Religious Diet Program. (ECF No. 57 at 25-26, No. 58-1 at 16-22.) Plaintiff also submitted affidavits from two Rastafarian inmates at FCI-Loretto who stated that they were not approved for or reinstated into the Certified Religious Diet Program by Defendants solely because they are

Rastafarian. (ECF No. 58-1 at 5-6.) However, the Court notes that for each of the seven Rastafarian inmates represented by the Inmate Requests for Administrative Remedies, the documentation indicates that their requests for participation in the program were denied because they did not have an understanding of the terms "certified processed food," "kosher," and/or "halal." (ECF No. 58-1 at 16-22.) Additionally, both Rastafarian inmates who submitted affidavits stated that their requests were denied by Defendant Palko because they did not have an understanding of the term "kosher." (ECF No. 58-1 at 5-6.)

Evidence produced by Defendants shows that Defendant Palko had denied requests from inmates of other religions based on the same lack of understanding. (ECF No. 53 at 2, 20.) It is evident that Defendant Palko believed that inmates who could not articulate the proper meaning or did not have a clear understanding of terms such as "certified processed food," "kosher," and/or "halal," should not be granted participation in the Certified Religious Diet Program regardless of their religious preference, and the evidence demonstrates that numerous inmates of diverse religious backgrounds were denied participation in the program for that reason. Even though Defendant Palko may have personally felt that Rastafarians could meet their religious dietary restrictions by participating in self-selection from the main line component of the Alternative Diet Program, Plaintiff's claims that he and other Rastafarian inmates were denied participation in the Certified Religious Diet Program solely based on their religious beliefs is simply not supported by the evidence.

Moreover, documents produced by both parties demonstrate that inmates with other religious preferences – including Muslim, Nation of Islam, Jewish, Buddhist, and "Other" – were also denied participation in the Certified Religious Diet Program and approved for the main line component of the Alternative Diet Program for which Plaintiff was also approved. Specifically,

30

Plaintiff submitted evidence of Notification of Religious Diet Accommodation forms from eighteen interviews conducted by the Chaplain from March 6, 2008, through December 6, 2008. (ECF No. 58-1 at 24-26, 28, 30, 34-46.)  Based on the information in the forms, it appears as though only seven of the eighteen inmates (of Jewish and Muslim faith) were approved for the Certified Religious Diet Program and the remaining eleven (Jewish, Muslim, Buddhist, Nation of Islam, Rastafarian, and "Other") were approved for the main line component of the program. Defendants also submitted additional Notification of Religious Diet Accommodation forms indicating that inmates of the Jewish, Muslim, and Nation of Islam faiths were also not approved for the Certified Religious Diet Program.  (ECF No. 53.)

While evidence presented by both parties shows that several Rastafarian inmates were denied participation in the Certified Religious Diet Program, their requests were denied only after individualized interviews were conducted by Defendant Palko wherein she carefully considered their responses to the interview questions and determined that their religious dietary restrictions would best be met by participation in the main line component of the Alternative Diet Program as opposed to the Certified Religious Diet Program.  The mere fact that a deliberate choice was made by Defendants to deny certain Rastafarian inmates participation in the Certified Religious Diet Program does not in and of itself mean that the choice was made with discriminatory intent.  *See* <u>Brown v. Byrd</u>, No. 00-3118, 2000 U.S. Dist. LEXIS 17354, at *13 (E.D. Pa. Dec. 1, 2000) citing <u>Arlington Heights v. Metropolitan Hous. Dev. Corp.</u>, 429 U.S. 252, 264-65 (1977) (In order to demonstrate an equal protection violation, a plaintiff must show more than just discriminatory impact; he must show proof of "discriminatory intent or purpose.") Plaintiff has not identified any evidence suggesting discriminatory intent or purpose.  Instead, the record evidence demonstrates that the denial of participation in the Certified Religious Diet

Program was based on responses to interview questions demonstrating that the Rastafarian inmate did not have a clear understanding of the purpose of the program, a reason for which inmates of other religious faiths were also denied participation.

Because Plaintiff has failed to present facts demonstrating that he was treated differently than similarly situated inmates as a result of intentional or purposeful discrimination, summary judgment should be entered in favor of Defendants with regard to Plaintiff's equal protection claims.

## III.  CONCLUSION

For the reasons set forth above, it is respectfully recommended that Plaintiff's Motion for Judgment on the Pleadings (ECF No. 44) be denied; Plaintiff's Motion to Dismiss, or in the alternative, Motion for Summary Judgment (ECF No. 59) be treated solely as a response to Defendants' Motion for Summary Judgment and denied as moot; and Defendants' Motion for Summary Judgment (ECF No. 49) be granted.

In accordance with the applicable provisions of the Magistrate Judges Act [28 U.S.C. § 636(b)(1)(B)&(C)] and Rule 72.D.2 of the Local Rules of Court, the parties shall have fourteen (14) days from the date of the service of this report and recommendation to file written objections thereto.  Any party opposing such objections shall have fourteen (14) days from the date on which the objections are served to file its response.  A party's failure to file timely objections will constitute a waiver of that party's appellate rights.

Dated:  February 13, 2012

Lisa Pupo Lenihan
Chief United States Magistrate Judge

cc: Steven Jean-Pierre
49152-053
Allenwood Low
Federal Correctional Institution
Inmate Mail/Parcels
P.O. Box 1000
White Deer, PA 17887

Counsel of record.